J-A02036-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| RITA ELIZABETH PULTRO | |
| Appellant | No. 1593 EDA 2015 |

Appeal from the Judgment of Sentence May 1, 2015
in the Court of Common Pleas of Delaware County Criminal Division
at No(s): CP-23-CR-0007119-2013

BEFORE: OTT, RANSOM, and FITZGERALD,* JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED DECEMBER 08, 2017**

Appellant, Rita Elizabeth Pultro, appeals[1] from the judgment of sentence entered in the Delaware County Court of Common Pleas after a jury found her guilty of murder of the first degree,[2] robbery,[3] conspiracy,[4] and carrying a firearm without a license.[5] Appellant claims that the trial court erred in denying her motion to suppress evidence obtained from a search of her cellphone, denying her motions to sever her case from her

---

* Former Justice specially assigned to the Superior Court.

[1] The appeals of Appellant's codefendants, Tariq Mahmud and David Wiggins, are listed at J-A02035-17 and J-A02037-17, respectively.

[2] 18 Pa.C.S. § 2502(a).

[3] 18 Pa.C.S. § 3701(a)(1)(i).

[4] 18 Pa.C.S. § 903.

[5] 18 Pa.C.S. § 6106(a).

codefendants, and admitting into evidence incriminating messages from her cellphone without adequate authentication. We affirm.

Appellant's conviction arises from the killing of Jason McClay at a Rite Aid store in the City of Chester, where McClay was a manager. The Commonwealth alleged the following. In August and September 2013, Tariq Mahmud was employed as loss prevention agent at the Rite Aid store. Mahmud, Ashaniere White, and Christopher Parks planned to rob the Rite Aid store. Mahmud told White and Parks about how much money was kept in the store's safe, who was working, and about blind spots in the store's video surveillance system. Mahmud warned them not to try to rob the store when McClay was working, because he was a former marine who would fight back.

On August 19, 2013, White and Parks robbed the Rite Aid store when McClay was not on duty. On August 26 and September 4, 2013, White and Parks again attempted to rob the store, but employees recognized White.

Mahmud, White, and Parks thereafter sought the assistance of new people to rob the store, and brought David Wiggins into their plans. Wiggins wanted another individual, Appellant, to participate as well. The group planned a robbery for September 18, 2013, but postponed it until September 19, 2013.

On September 19, 2013, McClay worked the day shift at the Rite Aid store and stayed for the evening shift due to the unavailability of another manager, Serita Cottman. Mahmud called out from work that day. At

- 2 -

approximately 9:45 p.m., an employee saw a white female, later identified as Appellant, and a black male, later identified as Wiggins, enter the store. Appellant retrieved a light bulb and took it to the counter. When the employee told her the amount due, Appellant complained that it was too expensive, placed the item back on the shelf, and asked to see the manager. McClay went back to the aisle, and he and Appellant began discussing lightbulbs. Wiggins then grabbed McClay and told McClay to take him to the safe. Wiggins and McClay began wrestling until Appellant shot McClay at close range at the base of his neck and killed him. Appellant and Wiggins fled from the store and left the scene in a vehicle driven by Parks.

The investigation into the shooting revealed that Wiggins left a palm print in the Rite Aid store. Investigators obtained a photograph of Wiggins and showed it to two employees, and they both identified Wiggins as one of the robbers. Wiggins was arrested on September 21, 2013, and admitted his role in the robbery. Wiggins identified Appellant as the other person with him in the store. Investigators also learned that Appellant was in contact with her friends and sister and obtained a new cellphone after the killing.

Appellant was arrested on September 22, 2013. Following her arrest, investigators obtained a warrant to search to Appellant's new phone. The search of Appellant's cellphone revealed that Appellant made inculpatory statements to her friend, whom she referred to as her wife, indicating that she "caught a body" and needed a "place to lay low." N.T., 2/2/15, at 208.

Appellant referenced the Rite Aid store in the news and also related that there was "a robbery gone wrong," and that police told "her brother" that he could face the death penalty, but she would not let him die for her. *Id.* at 209-10, 211.

Mahmud, Parks, and White were subsequently arrested. Parks and White pleaded guilty to third-degree murder in exchange for their cooperation, and the Commonwealth dropped charges of second-degree murder against them.

Appellant filed an omnibus pretrial motion seeking suppression of the evidence obtained from her phone and severance of her trial from codefendants. The trial court denied the motions on December 24, 2014.

Appellant, Mahmud, and Wiggins proceeded to a joint jury trial for the September 19, 2013 robbery and killing of McClay. Parks and White testified against them. The Commonwealth also introduced numerous text messages between the various parties, as well as Appellant's messages to her friend. The jury found Appellant guilty of first-degree murder, robbery, and conspiracy. The trial court sentenced Appellant to life imprisonment on May 1, 2015.

Appellant timely appealed and complied with the trial court's order to submit a Pa.R.A.P. 1925(b) statement. This appeal followed.

Appellant presents the following questions for review:

> 1. Whether the search of Appellant's cell phone, seized incident to her arrest, was in violation of the Fourth and

Fourteenth Amendments to the United States Constitution and Article 1 Section 8 of the Pennsylvania Constitution, where the warrant issued for the search of the phone failed to establish probable cause that the phone contained evidence of the crime.

2. Whether Appellant's rights to a fair trial, due process of law and confrontation of witnesses under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article 1 Sections 8 and 9 of the Pennsylvania Constitution, were violated by denial of Appellant's motion to sever her trial from co-defendant David Wiggins, where Wiggins' confession to police, redacted to remove references to Appellant by name, nonetheless implicated Appellant by virtue of other evidence introduced at trial.

3. Whether Appellant's right to due process and a fair trial, guaranteed by the Fourth, Fifth and Sixth Amendments to the United States Constitution and Article I Sections 8 and 9 of the Pennsylvania Constitution, as well as Pa.R.Crim.P. Rules 582 and 583, violated by the joinder of Appellant's trial with co-defendant Tariq Mahmud, where evidence was introduced at the joint trial that Mahmud was involved in three prior robberies of the same store, robberies in which Appellant played no part and evidence of which would not have been admissible at Appellant's trial.

4. Whether the trial court committed error of law and abuse of discretion, and violated Appellant's right to a fair trial and due process of law, in admitting into evidence, incriminating text messages obtained from Appellant's cell phone, where the Commonwealth failed to properly authenticate the text messages.

Appellant's Brief at 4-5.

Appellant first claims that the trial court erred in denying her motion to suppress evidence obtained from her cellphone pursuant to a search warrant. Relying on *Commonwealth v. Wright*, 99 A.3d 565 (Pa. Super. 2012), she contends that the affidavit of probable cause failed to

demonstrate that the phone was of evidentiary value or contained information related to the crimes. We disagree.

When reviewing a trial court's denial of a motion to suppress evidence obtained pursuant to warrant,

> [we are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of the courts below are subject to [ ] plenary review.

*Commonwealth v. Parker*, 161 A.3d 357, 361-62 (Pa. Super. 2015) (citation omitted).

> Article I, Section 8 and the Fourth Amendment each require that search warrants be supported by probable cause. "The linch-pin that has been developed to determine whether it is appropriate to issue a search warrant is the test of probable cause." "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted."
>
> [T]he United States Supreme Court established the "totality of the circumstances" test for determining

whether a request for a search warrant under the Fourth Amendment is supported by probable cause. [The Pennsylvania Supreme] Court adopted the totality of the circumstances test for purposes of making and reviewing probable cause determinations under Article I, Section 8. In describing this test, [the Pennsylvania Supreme Court] stated:

Pursuant to the "totality of the circumstances" test . . . the task of an issuing authority is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.

* * *

[Further,] a reviewing court [is] not to conduct a *de novo* review of the issuing authority's probable cause determination, but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.

As our United States Supreme Court stated: "A grudging or negative attitude by reviewing courts towards warrants . . . is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner."

*Commonwealth v. Jones*, 988 A.2d 649, 655-56 (Pa. 2010) (citations and footnote omitted). A search warrant generally is required to search the contents of a cellphone. *See Riley v. California*, 134 S. Ct. 2473 (2014).

In *Wright*, the police executed a warrant to arrest the defendant for a double homicide and a detective seized a cellphone on the nightstand next to where the defendant was found sleeping. *Wright*, 99 A.3d at 567-68. The trial court granted the defendant's motion to suppress concluding that the phone was not seized incident to arrest. *Id.* at 568. The Commonwealth appealed.

The *Wright* Court affirmed, holding that the seizure of the cellphone was improper under the plain view doctrine because the Commonwealth established that the incriminating nature of the cellphone was not immediately apparent. *Id.* at 569-70. The Court observed that an item may be immediately incriminating when officers "articulate specific evidence tying the seized object to the crime under investigation." *Id.* at 570 (discussing *Commonwealth v. Ellis*, 662 A.2d 1043 (Pa. 1995), *Commonwealth v. Jones*, 988 A.2d 652 (Pa. 2010), and *Commonwealth v. McEnany*, 667 A.2d 1148 (Pa. Super. 1995)). In the case before it, however, the detective seized the defendant's phone merely because "cell phones often have crucial pieces of evidence for our case," the defendant had a prior relationship with one of the victims, and the detective suspected that "he would find communication between the two shortly prior to the

murder." *Id.* The Court concluded that the detective's testimony fell short of evidence linking the phone to a crime and it was "pure conjecture" to believe that the phone or its contents were incriminating. *Id.* We emphasized that there was no evidence that the defendant had called the victim, as in *McEnany*, and no physical evidence, such as blood, on the phone itself, as in *Jones*. *Id.*

Instantly, the affidavit of probable cause recited facts related to the initial investigation into the killing of McClay, including the identification of Wiggins, Wiggins' arrest, and Wiggins' identification of Appellant as his accomplice. Of relevance to this appeal, the affidavit contained information that two individuals identified Appellant from surveillance photographs taken at the Rite Aid, that one of those witnesses, who knew Appellant for more than twenty years, communicated with Appellant by phone and text message within three days after the murder. The affidavit further stated:

> It was also learned during this investigation that [Appellant] communicated with persons other than witness #6 via cellular telephone calls and text messaging on or about Friday September 20, 2013 trough [sic] Sunday September 22, 2013.
>
> Your Affiant Detective Michael Jay, Delaware County Criminal Investigation Division Homicide Unit was assigned to assist with this investigation. Your Affiant has conducted and participated in numerous Homicide investigations, where cellular telephones were used by the actors and or victims before, during and after the crime.
>
> Your Affiant knows through training and experience that persons who conspire to commit crime together may use various forms of communication, including, but not limited

> to cellular telephones, to plan the crime or communicate information subsequently in an attempt to conceal the crime. Your Affiant also knows that demonstrating communication between two persons involved in a crime may assist in providing evidence of the conspiracy.

Aff. of Probable Cause, 9/25/13, at 4. Lastly, when taken into custody, Appellant had the cellphone in her possession and admitted that she was aware she was under investigation for "the robbery in Chester." *Id.*

Thus, the affidavit of probable cause presented evidence far stronger than in *Wright*, and the trial court correctly ruled that there was probable cause to search Appellant's phone. *See* Trial Ct. Op., 5/18/16, at 7-9. The affidavit established a fair probability that Appellant was a participant in the robbery and shooting and had conspired to do so. In addition, Appellant used the phone to communicate several days after the shooting and admitted she was a suspect for the robbery in Chester. Accordingly, there was probable cause to believe that evidence related to a conspiracy, a robbery, and the resulting the homicide could be found in Appellant's phone. *See Jones*, 988 A.2d at 655–56. Accordingly, no relief is due.

Appellant's second and third claims focus on the trial court's denial of her motions to sever her case from her codefendants. Our review is governed by the following precepts:

> Whether cases against different defendants should be consolidated for trial "is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." Procedurally, Rule 582 of the Pennsylvania Rules of Criminal Procedure governs the

joinder of separate criminal informations. Rule 582 dictates, in pertinent part, as follows:

(1) Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A). The severance of offenses is governed by Pa.R.Crim.P. 583, which states that the trial court "may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583.

Based upon these rules, our Supreme Court has formulated the following test for deciding the merits of a motion to sever:

Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must [ ] determine: [1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [6] [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative,

---

[6] The parties contest whether the admissibility of evidence prong is proper when analyzing the joinder of cases involving separate defendants whose offenses arise from a single incident. *See* Appellant's Brief at 36-37; Commonwealth's Brief at 44-45 (discussing *Commonwealth v. O'Neil*, 108 A.3d 900 (Pa. Super. 2015)).

[3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

***Commonwealth v. Melvin***, 103 A.3d 1, 28-29 (Pa. Super. 2014) (some citations omitted).

"[J]oint trials are preferred where conspiracy is charged. [Nevertheless, s]everance may be proper where a party can establish the co-defendants' defenses are so antagonistic that a joint trial would result in prejudice. . . . However, the party seeking severance must present more than a mere assertion of antagonism[.]"

***Commonwealth v. Housman***, 986 A.2d 822, 934 (Pa. 2009).

In her second issue, Appellant asserts that she was entitled to a separate trial from Wiggins because she suffered a ***Bruton***[7] violation based on the admission of Wiggins' confession. She asserts that the trial evidence made clear that she was the individual referred to in Wiggins' statement detailing the September 21, 2013 robbery, despite the redactions to the statement. Appellant acknowledges that the Pennsylvania Supreme Court has held that certain redactions of a non-testifying codefendant's confession do not violate ***Bruton***. Nevertheless, she argues that the United States Third Circuit Court of Appeals decision in ***Vazquez v. Wilson***, 550 F.3d 270 (3d Cir. 2008), stands as "an example why Pennsylvania's approach to ***Bruton*** and its progeny, as set out in [***Commonwealth v. Travers***, 768 A.2d 845 (Pa. 2001)], is incorrect." Appellant's Brief at 33. No relief is due.

---

[7] ***Bruton v. United States***, 391 U.S. 123 (1968).

- 12 -

In *Travers*, the Pennsylvania Supreme Court set forth guidance regarding *Bruton* claims.

> In *Bruton*, the trial court admitted into evidence at a joint trial the confession of Bruton's non-testifying co-defendant, which named and incriminated Bruton in the armed robbery on trial. The court instructed the jury that the confession "if used, can only be used against [Bruton's co-defendant]," and could not be considered in the case against Bruton. The Supreme Court reversed, holding that the admission of the facially incriminating statement by the non-testifying co-defendant violated Bruton's right of cross-examination guaranteed by the confrontation clause of the Sixth Amendment, notwithstanding the jury charge. The Court reasoned that:
>
> > There are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored . . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect. . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.
>
> In response to *Bruton*, courts approved the practice of redacting confessions of non-testifying co-defendants to remove references that expressly implicated the defendant.

*Travers*, 768 A.2d at 847 (citations omitted). After tracing United States Supreme Court decisions following *Bruton*, the *Travers* Court held that

redaction of a non-testifying codefendant's with neutral pronouns, coupled with cautionary instructions, would not violate **Bruton**. **Id.** at 851.

Moreover, the Pennsylvania Supreme Court has repeatedly rejected a "contextual implication theory"—that is, the linkage between the redacted statement and other evidence to implicate a specific defendant—"as a blanket rule." **Commonwealth v. Rainey**, 928 A.2d 215, 227 (Pa. 2007). Instead, our Supreme Court instructs that the danger posed by contextual implication "merely requires the trial court, and the reviewing court, to balance the interests, *i.e.*, the potential prejudice to the defendant versus the probative value of the evidence, the possibility of minimizing the prejudice, and the benefits to the criminal justice system of conducting joint trials." **Id.** at 228 (citation omitted).

Here, the statement by Wiggins implicating Appellant was redacted and presented to the jury in the following exchange between the Commonwealth and Detective David Tyler:

> [Commonwealth:] And question at page 2: "And we're going to ask you a few questions. Tell us about what happened that night." What was Mr. Wiggins' response?
>
> A "Me and this other person, we hooked up. They said we're supposed to rob the Rite Aid that night."
>
> Q Question: "And how long have you known the other person?"
>
> A Answer: "For a couple weeks now, three to be exact."

Q  Question: "Okay.  All right.  Tell us what about how  -- what was planned or what happened?"

A  Answer: "Well, this person came to me with a plan a couple days before we were supposed to do it.  They was supposed to be at the Rite Aid out of Chester.  This person told me a tall, fat girl was supposed to be  working and a short, brown-skinned girl was supposed to be working."

Q  Question: "At the Rite Aid that night?"

***

Q . . . "So the other person parks the  car  up  on  just  say on 10th Street underneath some trees.  That's where you guys got out?" Answer?

A  "Yes, sir."

Q  Question: "And you start walking in?"

A  "Yes, sir."

Q  Question: "You go in?"

A  "Yes, sir."

Q  "Where do you go?"

A  "I just start walking around the store down and met up in the aisle where the light bulbs was at."

Q  And this is Detective Collins: "Was anyone else in the store?  Could you tell if anyone else was in the store that wasn't an employee?"

A  "I mean, I think it was like two customers in the store. If people -- it was a man and a woman in the pharmacy."

Q  And  more  of  a  statement,  but  the  question  goes, "Okay."  And  then  you  ask  a  question,  and  you're identified: "So when you guys finally meet back at the light bulbs?"  Answer?

A  "Yes, sir."

Q  Question: "Was anything said like let's go get it?"

A  "No, sir.  The manager came.  He bent down, and went to show what lights they had.  I grabbed him and said take me to the safe.  We got into an altercation."

Q  Question: "How did you grab him?"

A  "From the back of his shoulders like the back of his shirt, grip it up his shirt."

Q  Question: "Did you act like you had anything in his back like your two fingers?"

A  "No, sir. Both of my hands were on him."

Q  Question: "Okay.  You told him take me to the  safe."

A  "Yes, sir."

Q  "And what happens then?"

A  "We start struggling.  He gripped me up.  I gripped him up.  Then I pushed him off me.  Went to turn and run,  and I was running, I heard a pop."

N.T., 2/9/17, at 132-33, 141-42.

The trial court also issued a cautionary instruction during its charge to the jury:

> There's a rule that restricts use by you of the evidence offered to show that the Defendant, David Wiggins, made a statement concerning the crimes charged.  The statement made before trial may be considered as evidence only against the Defendant who made that statement.  Thus, you may consider the statement as evidence against the Defendant David Wiggins if you believe he made the statement voluntarily.  You must not consider the statement as evidence against any of the other Defendants.

N.T., 2/11/15, at 24.

We conclude that the redactions to Wiggins' statement were neutral, did not expressly implicate Appellant, did not otherwise reveal Appellant's identity, and did not suggest that Appellant's name had been removed. Thus, the redaction comports with Pennsylvania law, and in conjunction with the trial court's cautionary instruction, we have no basis to grant Appellant relief. **Travers**, 768 A.2d at 847. To the extent that Appellant relies on the federal court's decision **Vazquez** in support of a contextual implication theory, that case does not control. **See Commonwealth v. Daniels**, 104 A.3d 267, 294 (Pa. 2014) (rejecting parties' reliance on **Vazquez** as non-binding decision from another jurisdiction). Therefore, we discern no basis to disturb the trial court's refusal to sever the trials of Appellant and Wiggins.

In Appellant's third claim, she claims that she was entitled to a separate trial from Mahmud. She contends, in a single sentence, that the evidence of the prior robbery and attempts to rob the Rite Aid store were inadmissible against her because she was not involved in those incidents. She further suggests that she suffered prejudice because the jury heard extensive testimony regarding those incidents and was cast together with the unsavory characters, including White and Parks, involved in those incidents. No relief is due.

There is no dispute the prior incidents were properly admitted against Mahmud to show knowledge, preparation, planning, and motive related to the conspiracy initiated by him, White, and Parks. While it is apparent that Appellant was not known to Mahmud, White, or Parks at the time of the first three incidents at the Rite Aid store, the prior incidents provided information necessary to the development of this case and Appellant's ultimate role in the robbery at issue at trial. Specifically, although the first robbery was successful, the second two attempts were thwarted because employees recognized White. By the second attempt, the Rite Aid store had posted a wanted poster of White. Mahmud, White, and Parks then elected to bring in an additional person, Wiggins, for the next planned robbery. Wiggins insisted that Appellant participate. Thus, the admission of the robberies was arguably proper against Appellant to establish the history of the case and how she became involved in the robbery of the Rite Aid store. *See Commonwealth v. Serrano*, 61 A.3d 279, 286 (Pa. Super. 2013) (concluding codefendant's sales of controlled substance in separate county, which led to investigation revealing other defendant's participation in narcotics trafficking, was admissible against other defendant to show history of the other defendant's case).

Even assuming the evidence regarding Mahmud's prior bad acts was not admissible, however, no relief is due. The admissibility or inadmissibility of the evidence in a separate trial is not determinative. *See Housman*, 986

A.2d at 834-35 (noting codefendant's admission of evidence against the defendant would not have been admissible in a separate trial, but fining no relief was due because prejudice was *de minimis* and did not overcome the factors in favor of the joint trial). The incidents were easily separable in time, by the participants of those crimes, and Appellant's clear lack of participation in the planning or execution of those crimes. Moreover, the evidence presented was not so inflammatory as to render the jury incapable of deciding fairly the charges against Appellant. Additionally, the trial court issued a cautionary instruction with respect to Mahmud's prior bad acts and that they should not be considered when evaluating the charges against any other defendant. Therefore, Appellant's assertion that the trial court erred in denying severance from Mahmud's trial lacks merit.

Appellant's final claim is that the trial court erred when admitting evidence of her text messages without sufficient indicia of authenticity. She argues that no witness testified she authored the inculpatory messages to her friend, and that there was insufficient circumstantial evidence in the content of the messages to establish that she sent them. She notes that the killing of McClay garnered news coverage and the incident at the Rite Aid store was a matter of public knowledge. We disagree.

It is well settled that the

> [a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value.

> Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.
>
> ***
>
> Pennsylvania Rule of Evidence 901 provides that authentication is required prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. Pa.R.E. 901(b)(1). Furthermore, electronic writings typically show their source, so they can be authenticated by contents in the same way that a communication by postal mail can be authenticated. Circumstantial evidence may suffice where the circumstances support a finding that the writing is genuine.
>
> ***
>
> [A]uthentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required.

*Commonwealth v. Koch*, 39 A.3d 996, 1002-03, 1005 (Pa. Super. 2011)

(citations omitted), *aff'd by evenly divided Court*, 106 A.3d 705 (Pa. 2014).

Instantly, the string of text messages to and from Appellant's friend began with the sender stating, "It's me your wife Rita." The sender then indicated that she had to "lay low" and asked her friend whether she had seen the news about the Rite Aid store. N.T., 2/2/15, at 208-10. The sender then stated she "caught a body." *Id.* at 208. At trial, the friend testified that she knew Appellant, and they called each other "wife." These

messages contained information consistent with a person being involved in the crime at Rite Aid. Thus, there was ample circumstantial evidence supporting the trial court's determination that the Commonwealth met its threshold burden of establishing that the text messages were what the Commonwealth purported them to be, namely, messages from Appellant. *See Koch*, 39 A.3d at 1005. Therefore, Appellant's challenge to the authenticity of the inculpatory message fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2017